# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

In the matter of:

SPORTSMAN'S LINK, INC.

    *Debtor*

EDWARD J. COLEMAN, III,
TRUSTEE

    *Movant*

v.

SOHAIL ABDULLA

    *Respondent*

Chapter 7 Case

Number <u>07-10454</u>

**FILED**
Samuel L. Kay, Clerk
United States Bankruptcy Court
Savannah, Georgia
By lbarnard at 3:34 pm, Dec 20, 2011

## MEMORANDUM AND ORDER
## ON TRUSTEE'S APPLICATION TO
## COMPROMISE CONTROVERSY

Currently pending before the Court is Trustee's Application to Compromise

Controversy filed on August 2, 2011, (Dckt. No. 695) by which the Trustee proposes to settle

on behalf of the bankruptcy estate, certain actual or potential causes of action for legal

malpractice against various attorneys and law firms that represented the Debtor corporation

before and during the Chapter 11 bankruptcy filed on March 13, 2007.  In response to the

Trustee's application, Sohail Abdulla ("Abdulla"), the sole shareholder of Sportsman's Link,

Inc. ("Sportsman's Link" or "Debtor") filed his Objection to Settlement. Dckt. No. 701. This matter came on for evidentiary hearing on October 14, 2011, pursuant to notice. Having reviewed the record in this matter, and having considered the testimony of the witnesses on October 14, 2011, as well as the exhibits tendered by both parties, the Court enters this Memorandum and Order.

## FINDINGS OF FACT

1. This case was filed as a Chapter 11 proceeding by the Debtor corporation on March 13, 2007.

2. Debtor operated a retail store known as Sportsman's Link in a 63,000 square foot facility in Village Plaza shopping center located at 596 Bobby Jones Expressway, Suite 21-A, Augusta, Georgia.

3. Debtor had occupied these premises under a commercial lease since 2001. Dckt. No. 312-1. The terms of this lease were negotiated by Abdulla. The original landlord under the lease was Glimcher Properties Limited Partnership, but the lease was assigned to USPG Portfolio Two, LLC ("USPG") in 2002. Trustee's Exh. 25. Debtor was considered a "major tenant" under the lease. Dckt. No. 312-1, Section 19.14.

4. Sometime prior to December 2003, Debtor became involved in a dispute with the landlord over the condition of the property, including the landlord's alleged failure to repair a leaky roof, the heating and air conditioning system, and the pavement in the parking lot. *See* Abdulla's Exh. 17.

5. The landlord/tenant dispute escalated into litigation beginning with the Debtor's filing of a Complaint for Breach of Contract in the State Court of Richmond County, Georgia on December 1, 2003. Trustee's Exh. 21 - 23. The Debtor alleged in this lawsuit that "Defendant has breached said lease agreement and has failed and refused to comply with the terms thereof by failing to keep the roof in repair causing damages and in failing to put up a sign as per the lease agreement." Trustee's Exh. 22. In this litigation, Sportsman's Link was represented by William J. Williams ("Williams") and the law firm of Johnston, Wilkin & Williams.

6. The Village Plaza shopping center where Sportsman's Link was located had a large tenant at each end, Walmart and Sam's Club. Abdulla's Exh. 26. At some point prior to August 2005, USPG and/or one or more of its tenants decided that they wanted to reconfigure the arrangement of the stores in the Village Plaza shopping center. This appears to have been motivated by a Department of Transportation road construction project near the corner of the shopping center that would have eliminated a portion of the parking lot in front of Sam's Club.

7. Accordingly, USPG, in coordination with one or more of its tenants, submitted plans to Richmond County for approval of these proposed changes in the layout of the shopping center.

8. In order to move Sam's Club to all or part of the space occupied by Sportsman's Link and Tractor Supply (Debtor's neighboring tenant), USPG approached Sportsman's Link with a proposal to buy out its remaining lease. This offer was set forth in

3

some detail in a letter dated August 11, 2005. Trustee's Exh. 16.

9. The USPG offer of a $1.6 million "termination payment" would require the Debtor to vacate the shopping center. The offer was contingent on numerous events, including the cooperation of Tractor Supply, and the execution of a new lease by Sam's Club. Trustee's Exh. 16.

10. Abdulla rejected this offer by his letter of August 19, 2005, due to the contingencies demanded by USPG. Trustee's Exh. 17.

11. After Abdulla's rejection of the offer, the litigation initiated by Sportsman's Link in 2003 remained pending in the State Court of Richmond County, Georgia as reflected in the court docket for that action. Trustee's Exh. 21.

12. There followed a new series of disputes between USPG and Sportsman's Link, partly reflected in a number of notices of default submitted by USPG. Abdulla's Exh. 19. Sportsman's Link claimed these alleged defaults under the commercial lease were pretexts for forcing Sportsman's Link out of its space so that the plans for Sam's Club could go forward. Williams continued to represent Sportsman's Link in connection with these issues of default.

13. USPG sent no fewer than eleven (11) letters of default from December 22, 2005, through March 7, 2007. Abdulla's Exh. 19. The alleged defaults under the lease included improper subleasing, improper maintenance, unauthorized use of grassy areas for displaying merchandise, improper hours of operation, and environmental contamination. The letter of June 8, 2006, from the law firm of McKenna, Long & Aldridge also purported to

terminate the lease based on the number of prior defaults. Abdulla's Exh. 19.

14. On January 18, 2006, Sportsman's Link filed a new lawsuit against USPG in the Superior Court of Richmond County, Georgia seeking declaratory judgment, injunctive relief, and damages. Trustee's Exh. 25. In its complaint, Sportsman's Link alleged that the landlord "has attempted to get Plaintiff to terminate the lease voluntarily, which Plaintiff has not agreed to do," and that the landlord sent default notices in bad faith. Id. at ¶ 5, 12. Debtor sought declaratory relief that its uses of the property were permitted under the lease.

15. On August 15, 2006, USPG filed an amended answer in the Richmond County Superior Court action asserting a counterclaim, seeking to dispossess Sportsman's Link from the retail space it occupied based on the alleged defaults under the lease. Trustee's Exh. 25. This matter was scheduled for a dispossessory hearing in Superior Court on March 14, 2007.

16. The two lawsuits filed by Sportsman's Link against USPG in 2003 and 2006 were not the only litigation involving the Debtor prior to this bankruptcy case. On December 19, 2006, one of Sportsman's Links important vendors, Henry's Tackle, LLC ("Henry's Tackle") filed suit against the Debtor in the Superior Court of Richmond County for $460,650.06 plus interest at 18% per annum and attorneys fees. Trustee's Exh. 32. Debtor filed a timely answer to that lawsuit denying the allegations. Trustee's Exh. 33.

17. In addition, on December 14, 2006, Debtor was served with Notice of Revocation of its Federal Firearms License by the Bureau of Alcohol, Tobacco, Firearms and

Explosives (ATF). *See* Trustee's Exh. 36. Debtor made a request for an administrative hearing which was held on June 12, 2007. As a result of that hearing, Debtor received a Final Notice of Revocation of Firearms License effective October 10, 2007. Debtor filed in U.S. District Court for the Southern District of Georgia a Petition for De-Novo Judicial Review (Case No. 1:07-CV-00162). Trustee's Exh. 36. Abdulla testified at the hearing on October 14, 2011, that the basis for the license revocation was groundless and that he had good defenses to that administrative action.

18. The Debtor was involved in other litigation prior to filing bankruptcy as reflected in its Statement of Financial Affairs (Dckt. No. 46, ¶ 4), including the defense of two suits by vendors.

19. On the eve of the scheduled March 14, 2007, dispossessory hearing, the Debtor retained as counsel Scott J. Klosinski ("Klosinski") and his firm Klosinski Overstreet, LLP ("Klosinski Overstreet"), for the purpose of filing a Chapter 11 Bankruptcy petition.

20. Contemporaneously with the filing of the Chapter 11 Petition, Klosinski filed an application to have his firm appointed as counsel for the Debtor. Dckt. No. 17. Attached to the Application was Klosinski's affidavit of disinterestedness. In addition, Klosinski filed his Bankruptcy Rule 2014(a) Verified Statement of Proposed Attorney. Dckt. No. 18. The Court approved the Debtor's employment of Klosinski Overstreet in its Order of March 16, 2007. Dckt. No. 22.

21. Klosinski also filed on March 13, 2007, an application to employ the firm of Johnston, Wilkin & Williams on behalf of the Debtor. Dckt. No. 19. The Court

6

approved the Debtor's employment of Johnston, Wilkin & Williams in its Order of March 16, 2007. Dckt. No. 23.

22. The case was scheduled for a Meeting of Creditors pursuant to 11 U.S.C. § 341 on April 11, 2007. Dckt. No. 14. Abdulla appeared for the 341 examination and was questioned at length by Assistant United States Trustee Joel Paschke and counsel for various creditors. A transcript of that meeting reflects that Abdulla was questioned about the Debtor's Schedules and the Statement of Financial Affairs. Dckt. No. 259. There were a number of ambiguities, omissions, and other errors in the schedules and the statement of financial affairs that Klosinski agreed to amend, as necessary. The United States Trustee filed its "Chapter 11 - 341 Meeting Summary" on July 11, 2007. Dckt. No. 120. This summary report reflected the Debtor's intention to amend certain items in the schedules. No such amendments were ever filed.

23. The 341 meeting transcript (Dckt. No. 259) and the United States Trustee's Chapter 11 - 341 Meeting Summary (Dckt. No. 120) also reflect testimony by Abdulla regarding his practice of loaning money to the Debtor and being repaid in the form of payments by Sportsman's Link to Abdulla's personal creditors. *See* Dckt. No. 259, ¶ 69-79. These pre-petition payments to Abdulla or to Abdulla's personal creditors were reflected in Paragraph 3.c. of the Statement of Financial Affairs. Dckt. No. 46.

24. The pending disputes between the Debtor and USPG wound their way into this Court on March 21, 2007, when USPG filed its Motion for Relief from Stay and for Possession of Premises. Dckt. No. 33. The landlord/movant alleged that the Debtor's lease

7

had been terminated pre-petition and that the premises were not property of the estate. Dckt. No. 33, ¶ 4, 5.  In support of its Motion for Stay Relief, the landlord submitted the affidavit of its general counsel, Richard L. Gerhardt, who described the various alleged pre-petition defaults leading to the termination of the lease. Dckt. No. 35.

25.  The Debtor filed its Response to Motion for Relief from Stay (Dckt. No. 49), through counsel  Klosinski, and asserted in that response that the lease had not been terminated, that "there is an ongoing Lease Agreement between Sportsman's Link, Inc. and USPG Portfolio Two, LLC", that the lease was a valuable part of the property of the estate, that all payments have been made under the lease, and that USPG was not entitled to possession. Dckt. No. 49, ¶ 4 - 8.

26.  The landlord's motion for stay relief came on for hearing on April 30, 2007. Dckt. Nos. 56, 67.  At that hearing, Klosinski argued on behalf of the Debtor that the landlord's pre-petition notice of default and/or termination was defective in that it was not mailed by certified mail, as required by the lease. Hearing Transcript, Dckt. No. 221, p. 13 (Apr. 30, 2007). Moreover, Klosinski asserted that the notice was sent to the wrong address. Id. at 14.  Finally, Klosinski argued that the termination letter did not provide the required five-days notice under the lease. Id.  All other termination notices refer back to the letter of June 8, 2006, and accordingly suffered from the same alleged defects.  The hearing was continued, and on June 5, 2007, USPG withdrew its Motion for Relief From Stay and for Possession of the Premises without prejudice. Dckt. No. 85.

27.  On June 5, 2007, Klosinski filed an application to employ the firm of

Thompson & Smith on behalf of the Debtor. Dckt. No. 88. This application recited that: "included in Debtor's assets are certain claims against US Properties, USPG, the Debtor's Landlord and/or Walmart, which as of the time of the instant Chapter 11 filing, had not yet been liquidated." Dckt. No. 88, ¶ 3. The Court approved, subject to a twenty (20) day period for objections, the Debtor's employment of Thompson & Smith in its Order of June 13, 2007. Dckt. No. 92.

28. Just as the USPG dispute was carried over into the bankruptcy case, so, too, was the dispute with Henry's Tackle. Henry's Tackle retained bankruptcy counsel in the person of Louis Saul ("Saul"). Dckt. No. 63.

29. Henry's Tackle was an unsecured creditor, and at the hearing on USPG's Motion for Stay Relief on April 30, 2007, Saul advised the Court that Henry's Tackle did not support the landlord's position on default and that Sportsman's Link should be allowed to continue to occupy the leased premises "as a going concern." Hearing Transcript, Dckt. No. 221, p. 16-17 (Apr. 30, 2007). Saul expressed concern that requiring the Debtor to move to a new location would diminish the value of its inventory. Id. at 16.

30. On May 14, 2007, Saul filed a Motion for a Rule 2004 Examination (Dckt. No. 70) of Abdulla, and moved the Court for an Order compelling Abdulla to produce certain financial records.

31. On June 13, 2007, Saul filed a proof of claim (Claim No. 25) on behalf of Henry's Tackle for an unsecured claim in the amount of $547,219.49. Trustee's Exh. 50. Attached to this Proof of Claim was a calculation of the interest and attorney's fees

9

component of the claim, together with approximately 260 pages of supporting invoices.

32.   On June 26, 2007, Saul filed on behalf of Henry's Tackle an Application for Appointment of a Trustee (Dckt. No. 107) and sought an expedited hearing on that motion. Dckt. No. 109. Saul asserted numerous grounds for the appointment of a trustee. The hearing was held on July 18, 2007, in Augusta. Dckt. Nos. 116, 140.

33.   On or about July 18, 2007, Henry's Tackle secured the personal guaranty of its debt from Abdulla. Guaranty, Abdulla's Exh. 10. The Guaranty recited that it was given to obtain "forbearance" of Henry's Tackle's Motion for Appointment of a Trustee, and thus Abdulla's execution of the Guaranty enabled the Debtor's continued operation, with Abdulla controlling management of the Debtor corporation rather than turning management over to an independent trustee.  In the Guaranty, Abdulla, Ayesha Chowan (Abdulla's wife), Why Pay More, LLC, and Sportsman's Link stipulated that the amount owed to Henry's Tackle was $549,219.49.[1] Abdulla's Exh. 10.  Thereafter, Henry's Tackle withdrew its Motion for Appointment of a Trustee (Dckt. No. 145), its Motion for Inspection (Dckt. No. 148), and its previously filed objection to the appointment of Thompson & Smith (Dckt. No. 156).

34. On July 18, 2007, Henry's Tackle amended its proof of claim and added as an attachment the original credit application submitted by Sportsman's Link in May 1998. Trustee's Exh. 50B. This credit application provided for the assessment of reasonable

---

[1]The Guaranty stated that "Guarantors and Sportsman's Link, Inc., agree to the principal plus interest as of the date of filing.  The amount owed to 'Lender' is $547,219.49 the 'Debt' [sic] . . . 'Debt' as used in this Guaranty is defined as the sum claimed on the Proof of Claim . . . as amended." Guaranty, Abdulla's Exh. 10. The Guaranty also defines "indebtedness" as including attorney's fees. Id. at Section 2.

attorney's fees in the event of collection. Having obtained the personal guaranty of Abdulla in the full amount of the claim filed by Henry's Tackle, this creditor did not file any other motions in this case.

35. After the bankruptcy case was filed, USPG and Sportsman's Link continued to explore settlement options. USPG sent a proposal on May 25, 2007, for a lease termination payment to the Debtor of $250,000.00 plus a waiver of rent for June - September 2007; the proposal also contemplated mutual releases and dismissals of all pending actions between the parties. Trustee's Application to Compromise Controversy, Dckt. No. 695, Exh. "A". This proposal did not contemplate a relocation of the Debtor within Village Plaza shopping center.

36. On May 30, 2007, Klosinski and Williams filed an Adversary Proceeding (A.P. No. 07-01031) on behalf of the Debtor against USPG. Dckt. No. 81; Trustee's Exh. 51B. The allegations of this complaint were virtually identical to those in the 2003 Richmond County State Court Complaint for Breach of Contract. *See* Trustee's Exh. 22.

37. On June 19, 2007, USPG made a second proposal that contemplated moving the Debtor to a smaller space in Village Plaza (39,960 square feet) on or before September 30, 2007, and payment of moving expenses "up to $100,000." Trustee's Application to Compromise Controversy, Dckt. No. 695, Exh. "B".

38. In the midst of these negotiations between Sportsman's Link, USPG, and Henry's Tackle, the statutory deadline by which the Debtor corporation could have

formally moved to assume the USPG lease, came and went on July 11, 2007, without a formal written motion and order allowing assumption.

      39. Seizing upon this July 11, 2007, deadline, USPG filed its Motion for Possession of Premises (Dckt. No. 137) on July 17, 2007, which stated in part as follows:

> USPG has contended throughout this case that The Lease between the Debtor and USPG terminated pre-petition. This issue has now been rendered moot because The Lease has now been deemed rejected under Section 365(d)(4) of the Bankruptcy Code.

Dckt. No. 137, ¶ 2.

      40. The Debtor then filed an Amended Debtor's Motion to Extend Exclusivity Period (Dckt. No. 138), by which it sought an extension of time to assume the lease. Pleading in the alternative, the Debtor contemporaneously filed its Motion for Formal Order Providing that it has Assumed an Unexpired Lease Pursuant to 11 U.S.C. § 365. Dckt. No. 139. These motions came on for hearing before the Court on August 22, 2007, and the Court took the matter under advisement. Hearing Transcript, Dckt. No. 192, p. 39 (Aug. 22, 2007).

      41. USPG made one final settlement proposal to the Debtor in the form of a letter of August 23, 2007, (Trustee's Application to Compromise Controversy, Dckt. No. 695, Exh. "C") which contained three options from which the Debtor could choose:

> Option One: "Move for term, plus $150,000.00"
> Option Two: "Move for shortened term, plus $250,000.00"
> Option Three: "Buy-Out for $350,000"

Under the first two options, the Debtor would move to a space in Village Plaza not far from its existing location, but the lease would expire in November 2011, or November 2009, respectively. The third option would require that the Debtor move out completely by December 2007.

42.   In response to these proposals, Williams submitted his own set of proposals in a letter dated August 27, 2007, reflecting demands for substantial sums of money and accusing USPG of bad faith. Abdulla's Exh. 5.   In response, Robin Phelan's letter of August 29, 2007, on behalf of USPG "declined" the proposals. Trustee's Application to Compromise Controversy, Dckt. No. 695, Exh. "D".   Phelan confirmed the landlord's position regarding a large lease buy-out:   "The prior negotiations between USPG and Sportsman's Link referenced in your letter took place in 2005.   They involved a number of contingencies which have not occurred, and such negotiations are irrelevant to the current situation." Id. at ¶ 2.

43. This Court issued an Order on October 31, 2007, which denied USPG's motion for possession of the leased premises and held as follows: "The facts on record taken in connection with Debtor's counsel's repeated oral request seeking permission to sublease part of the Premises leads me to the conclusion that the Debtor did request permission to assume the Lease in a timely manner." USPG Portfolio Two, LLC v. Sportsman's Link, Inc. (In re Sportsman's Link, Inc.), Case No. 07-10454, Dckt. No. 181, at 18-19 (Dalis, J. Oct. 31, 2007).   Judge Dalis further ordered that "a date for hearing shall be set to allow Debtor the opportunity to show that it can satisfy the requirements of 11 U.S.C. §365(b)." Id. at 20.

USPG filed its Notice of Appeal as to this ruling. Dckt. No. 214.

44. The Debtor's Motion to Extend Exclusivity Period (Dckt. Nos. 119 and 138) came on for hearing on November 13, 2007. On November 29, 2007, the Court granted this Motion and held that "the period under 11 U.S.C. § 1121 during which only Sportsman's Link may file and solicit acceptances for a plan of reorganization is extended up to and including the date of the confirmation hearing on the Debtor's Plan and Disclosure Statement, but in no event beyond November 13, 2008." Sportsman's Link v. USPG Portfolio Two, LLC (In re Sportsman's Link, Inc.), Case No. 07-10454, Dckt. No. 217, at 10 (Dalis, J. Nov. 29, 2007).

45. The Debtor had filed a Plan of Reorganization on October 9, 2007, (Dckt. No. 176) together with a Disclosure Statement (Dckt. No. 177). The Plan called for Henry's Tackle to be placed in a separate class and to be paid in full. The Plan and Disclosure Statement were withdrawn in January 2008. Dckt. No. 230.

46. A hearing on the lease assumption issue was held on March 18, 2008. At the conclusion of the hearing, Judge Dalis ruled that the Debtor would be permitted to assume the lease. Hearing Transcript, Dckt. No. 347, p. 158 (Mar. 18, 2008). Judge Dalis seemed troubled by the added administrative expense that a lease assumption would represent.[2] The Court approved the lease assumption by its Order of April 2, 2008 (Dckt. No. 286), but it is clear from the transcript of that hearing that the Court's decision was based in

---

[2] ". . . Mr. Miller [USPG's retail consultant] hit a nerve with me when he said that if I allow the assumption, all of a sudden we've got this higher level of obligation on the part of the Debtor to pay the rent. And I'm looking at financials that tells me . . .the sales has just gone · ·· for the last two years, just gone straight down." Hearing Transcript, Dckt. No. 347, p. 145 (Mar. 18, 2008).

large part on Abdulla's willingness to pledge certain real estate on Washington Road owned by Why Pay More, LLC, and Abdulla's representation that there was substantial equity in that property.[3] *See* Hearing Transcript, Dckt. No. 347, p. 90-93 (Mar. 18, 2008).

47.   On May 5, 2008, the Debtor filed a Motion for Instruction on Ambiguities in Lease (Dckt. No. 312) by which the Debtor sought declaratory relief on various matters, including the permissible use of the leased premises, the right to "license" portions of the premises and the parking lot, and a determination of any pro-rata share of property taxes the Debtor might owe as additional rent under the lease. The docket reflects that the clerk treated this as an adversary proceeding and assigned Adversary Proceeding Number 08-01017. On May 22, 2008, the Debtor filed a Complaint for Instruction on Ambiguities in Lease (A.P. No. 08-01017, Dckt. No. 5) together with a Certificate of Interested Parties. On June 25, 2008, USPG filed an Answer and Counterclaim. A.P. No. 08-01017, Dckt. No. 9. This adversary was dismissed with prejudice by this Court's order on January 30, 2009. A.P. No. 08-01017, Dckt. No. 23.

48.   On June 16, 2008, the United States Trustee moved for conversion to Chapter 7 or dismissal based on the continued decline in inventory and mounting losses. Dckt. No. 334. That matter was scheduled for a hearing on July 22, 2008.

49.   Correspondence among Klosinski and Abdulla's wife in June 2008,

---

[3] "And but for the offer here of the principal [Abdulla] of the debtor to pledge additional assets for the payment of claims in the case, I would question whether or not there was sufficient adequate assurances of future performance based on the recent history of the Debtor in terms of sales and inventory assets. But with the proposed pledge through a trust arrangement, I find that . . . this Debtor can, with that pledge of additional assets, perform under the lease during the balance of the term of the lease." Hearing Transcript, Dckt. No. 347, pp. 157-58 (Mar. 18, 2008).

reflects a frank discussion of the poor prospects for reorganization. Abdulla's Exh. 14.

50. On July 16, 2008, Klosinski filed a Motion for Continuance of the July 22, 2008, hearing on the motion to convert or dismiss, and in support of that motion attached a letter from Abdulla's doctor. Dckt. No. 350. The United States Trustee filed objection to the request for continuance. Dckt. No. 351.

51. The July 22, 2008, hearing went forward and Klosinski announced that the Debtor could not reorganize but would propose a liquidating Chapter 11 plan over 5 months. Hearing Transcript, Dckt. No. 436, ¶. 9-10 (Jul. 22, 2008). At the conclusion of the July 22, 2008, hearing Judge Dalis determined that liquidation by a Chapter 7 trustee was preferable to a Chapter 11 liquidation. Id. at 56-57. The Court expressed disappointment that the substantial equity in the Why Pay More, LLC real estate never materialized. Of concern to the Court was the need for a trustee to examine the financial transactions between Abdulla and the Debtor.

52. The case was converted to a Chapter 7 proceeding on July 22, 2008. Conversion Order, Dckt. No. 357 (Jul. 22, 2008). Edward J. Coleman III was appointed Chapter 7 Trustee. Dckt. No. 358.

53. The Debtor filed a Motion to Reconsider the conversion to Chapter 7 on July 31, 2008, to which Klosinski attached an affidavit of Abdulla. Dckt. Nos. 375, 378. The Debtor's motion and Abdulla's affidavit continued to suggest equity existed in the Why Pay More, LLC real estate, of which $250,000.00 might be available to the estate. Abdulla also proposed to convey to the estate his personal collection of animal mounts and guns to

be sold for the benefit of creditors, conditioned upon the Court vacating the Order of Conversion. Dckt. No. 375.

54. Abdulla later testified that he had no recollection of reading the affidavit of July 31, 2008, before signing it. He testified further that, in July 2008, he was suffering from something akin to a nervous breakdown, could hardly function, and could not make important decisions. Abdulla testified that his emotional problems had caused him to be absent from the Debtor's store most of the time dating back to March or April 2008.

55. On August 4, 2008, the Court entered an Order denying Debtor's Motion for Reconsideration. Dckt. No. 381.

56. A few days later, Abdulla left the United States, traveling with his family first to Dubai, and then on to Pakistan where he remained until November 2009.

57. In his investigation of the case, the Trustee became aware of tax escrow funds being held by Klosinksi, and on July 30, 2008, the Trustee filed a Motion for Turnover of the same. Dckt. No. 373. On November 13, 2008, the Court entered a consent order providing that those funds constituted pre-conversion rent, and were not property of the estate. Dckt. No. 466. The funds were ordered released to USPG. Id.

58. The Trustee began liquidating the tangible assets (inventory, furniture, and fixtures) of the Debtor corporation through a sell down and auction in October 2008, pursuant to his Application, (Dckt. No. 407) which was approved by this Court on September 16, 2008. Consent Order, Dckt. No. 423 (Sep. 16, 2008).

59. Contemporaneously with his plans for liquidating the assets of the

17

Debtor, the Trustee negotiated a settlement with USPG by which the landlord's substantial rent claims were largely waived in favor of a dismissal of all pending litigation between the Debtor and USPG. *See* Trustee's Affidavit, Dckt. No. 748, ¶ 35, 41. USPG agreed to withdraw its claims in this matter and ultimately did so on September 14, 2011. Dckt. No. 714.

60. Pursuant to that settlement, the Trustee's Notice of Intent to Abandon Claims, and to Dismiss the Same with Prejudice was filed October 16, 2008. Dckt. No. 444. The abandonment was intended to encompass all of the pending litigation between USPG and the Debtor, including the two state court actions filed in 2003 and 2006, the two pending adversaries (A.P. No. 07-01031 and A.P. No. 08-01017), and the pending appeals. Trustee's Affidavit, Dckt. No. 748, Exh. A, ¶ 65, 66. The Notice of Intent to Abandon also recited Trustee's intent "to bring adversary proceedings against the sole shareholder and chief operator of Debtor." Dckt. No. 444, ¶ 7.

61. The Notice of Proposed Abandonment (Dckt. No. 445) set a deadline of November 6, 2008, for objections to be filed. No objections to the abandonment were filed by the deadline, and the abandonment was self-executing once the deadline expired.

62. On November 4, 2008, Abdulla sent an email message to Williams that read, in part: "Money is almost extinct from me . . . I don't know if you can speak to the trustee and let him know that it will be a fruitless fight against me as the tree is dead." Abdulla's Exh. 2.

63. After liquidating the tangible assets of the Debtor, the Trustee turned

his attention to the pursuit of adversary proceedings to set aside preferences and fraudulent conveyances on behalf of the estate.

64. The Trustee filed his Application to Employ Professionals for a Special Purpose Pursuant to 11 U.S.C. §327(e) seeking to employ Klosinski Overstreet to file adversary proceedings to recover these preferences and fraudulent conveyances. Dckt. No. 501. Attached to that application was the affidavit of Klosinksi regarding his disinterestedness. This application and affidavit disclosed Klosinski Overstreet's prior representation of the Debtor. The employment of Klosinski Overstreet was approved without objection by this Court's Order of February 26, 2009. Dckt. No. 507.

65. The Trustee filed twenty-three (23) adversary proceedings against various third parties to recover certain alleged preferences and/or fraudulent conveyances. Dckt. Nos. 519-541. Compromises of many of those adversaries were approved by the Court resulting in gross recoveries to the estate of approximately $514,000.00. Trustee's Affidavit, Dckt. No. 748, Exh. A, ¶ 71.

66. In those adversaries that did not settle, the Court conducted a consolidated hearing in February 2011, on the issue of insolvency, and ultimately issued an Order determining that the Trustee failed to carry his burden of proof on the issue of insolvency. Coleman v. American Concrete, Inc., (In re Sportsman's Link, Inc.), A.P. No. 09-01058, Dckt. No. 71 (Davis, J. May 24, 2011). The remaining adversaries were dismissed and closed. Dckt. Nos. 704 -707.

67. During his administration of the estate, the Trustee has, at various

19

times, filed objections to certain proofs of claim. *See* Dckt. Nos. 484, 566, 574, 575, 576, 577, 578, 580, 674, 711, 712, 724, 741, 746 and 747.

68.  The Trustee's accountant has apparently prepared and filed tax returns for the years 2008, 2009, and 2010, and the case is close to being ready for final distribution. Trustee's Affidavit, Dckt. No. 748, Exh. A, ¶ 74.

69.  On December 15, 2010, Abdulla filed a legal malpractice case in the United States District Court for the Southern District of Georgia against Klosinski, Klosinski Overstreet, Johnston, Wilkin & Williams, and the Estate of Williams (Case No. 1:10-CV-00159). Trustee's Affidavit, Dckt. No. 748, Exhibit A, ¶ 75. Abdulla is represented in the action by Tucker S. Player ("Player"). Abdulla's main allegation in his individual legal malpractice case is that he was improperly advised to sign the personal guaranty of the debt owed by Sportsman's Link, Inc. to Henry's Tackle, LLC and was later sued on that guaranty and suffered a default judgment. Id.

70.  On or about July 6, 2011, the Trustee was contacted by Player regarding a proposed *new* legal malpractice action to be filed against the same Defendants as in Abdulla v. Klosinski et al., on behalf of the Debtor corporation. The principal basis for this new malpractice action was that the Defendants had caused the Debtor corporation to fail to timely assume the lease with USPG. Player advised that he had obtained an affidavit from an attorney in support of such legal malpractice claims, and he offered to pursue that litigation on behalf of the estate on a contingency fee basis. Player further advised that July 11, 2011, might be the statute of limitations for filing the action. Trustee's Affidavit, Dckt.

No. 748, ¶ 5.

71. In response to this solicitation, the Trustee expressed skepticism about the merits of such a case and advised Player that he would consult with the United States Trustee regarding the matter. The United States Trustee's office suggested that the Trustee could either (1) take no action, (2) affirmatively move to abandon the "cause of action", or (3) suggest that Player move for abandonment. Trustee's Affidavit, Dckt. No. 748, ¶ 6.

72. On or about July 8, 2011, the Trustee advised Player that he declined the offer to hire Player to file a legal malpractice case and further advised that Player could move for abandonment so that creditors and parties in interest could be heard on the matter. Trustee's Affidavit, Dckt. No. 748, ¶ 7. At that time, Player advised the Trustee that he would file the adversary proceeding before July 11, 2011, in order to preserve the claim for the Estate.

73. On July 11, 2011, Player filed an Adversary Proceeding (hereinafter "Player's adversary") (A.P. No. 11-01031) against Klosinski, Klosinski Overstreet, Johnston, Wilkin & Williams, and The Estate of Williams (hereinafter the "Defendants"). Dckt. No. 687. The named plaintiff in that adversary proceeding is Sportsman's Link, Inc.

74. The Complaint for legal malpractice was filed by Player purportedly as "Attorney for Plaintiff." However, as conceded by Player during a hearing on August 3, 2011, the Trustee did not authorize the filing of this adversary proceeding. Hearing Transcript, Dckt. No. 708, p. 9 (Aug. 3, 2011). The Trustee did not advise Player to file the adversary and did not express an intention to seek the Court's permission to employ him

21

pursuant to 11 U.S.C. §327( c) or as special counsel pursuant to 11 U.S.C. §327(e). Trustee's Affidavit, Dckt. No. 748, ¶ 8.

75. Contemporaneously with the filing of the adversary proceeding, Player filed a Motion to Compel Trustee to Abandon/Hire Player Law Firm, LLC as Special Counsel, by which he sought an Order compelling the Trustee to abandon the purported cause of action. Player's Complaint, Dckt. No. 688. Player filed the Motion to Compel as "Attorney for Sohail Abdulla." Id.

76. The Trustee subsequently received a settlement offer from counsel for the Defendants named in this newly filed adversary proceeding. The Defendants proposed to pay into the estate the total sum of $20,000.00 in full settlement of any causes of action that the Debtor corporation may have against one or more of the Defendants. Trustee's Affidavit, Dckt. No. 748, ¶ 10.

77. On August 2, 2011, the Trustee filed an Application to Compromise Controversy and Response to Motion to Compel Abandonment of Cause of Action (Dckt. No. 695) to accept this settlement offer in exchange for a full release of claims for legal malpractice asserted in this adversary proceeding or any such claims that the Debtor could have asserted.

78. Abdulla filed an Objection to Settlement (Dckt. No. 701) together with twenty-eight exhibits, including correspondence, emails, excerpts from hearing and deposition transcripts, and other material.

79. The Trustee's Application to Compromise Controversy was noticed for

objections (Dckt. No. 719) and the matter came on for evidentiary hearing on October 14, 2011.

## CONCLUSIONS OF LAW

Under Federal Rule of Bankruptcy Procedure 9019(a), "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct." FED. R. BANKR. P. 9019(a). In acting on the motion, an evidentiary hearing is not necessarily required. Depoister v. Mary M. Holloway Found., 36 F.3d 582, 586 (7th Cir. 1994). The factors which the Court should consider in approving a compromise include: (a) the probability of success in the litigation; (b) the difficulties to be encountered, if any, in the matter of collection; ( c) the complexity, expense, inconvenience, and delay of the litigation involved; and (d) the paramount interest of the creditors and a proper deference to their reasonable views. Wallis v. Justice Oaks II, Ltd., 898 F.2d 1544, 1549 (11th Cir. 1990). "Courts consider these factors to determine 'the fairness, reasonableness and adequacy of a proposed settlement agreement.'" Chira v. Saal (In re Chira), 567 F.3d 1307, 1312–13 (11th Cir. 2009). In examining the relevant factors, courts have deferred to the Trustee's business judgment when reasonable. See e.g., McMasters v. Morgan (In re Morgan), 2011 WL 3821102 (11th Cir. 2011).

The Trustee concedes that the difficulties of collecting a judgment is not relevant in this matter. Accordingly, the Court will address the other factors as it relates to the Trustee's proposed settlement.

## Probability of Success in the Litigation.

The Court's first step is to assess the probability of success of the allegations of legal malpractice as set forth in Player's adversary and of any additional grounds that might be gleaned from the Objection to Settlement. To prevail in a legal malpractice action, a plaintiff must show that (1) he employed the defendant attorney, (2) the attorney failed to exercise ordinary care, skill, and diligence; and (3) this failure was the proximate cause of damages to the client. Howard v. Sellers & Warren, P.C., 709 S.E.2d 585, 589 (Ga. App. 2011). The alleged acts of negligence, summarized below, have been addressed by the Trustee in both his original Application to Compromise (Dckt. No. 695) and his Affidavit in Support of Compromise. Dckt. No. 748.

### (A) The USPG Lease Assumption

Player's Complaint argues that the Defendants' failure to file a motion to assume the USPG lease prior to the statutory deadline[4] of July 11, 2007, damaged the Debtor's ability to reorganize by "damag[ing] the value of the lease and eviscerat[ing] the Debtor's negotiating leverage with USPG." Player's Complaint, Dckt. No. 688, ¶ 19. The Complaint

---

[4]See 11 U.S.C. § 365(d)(4)(A).

further alleged that "as a result of the Defendants' failure to properly assume the lease, USPG never offered more than $350,000.00 to buy out Plaintiff's lease." <u>Player's Complaint</u>, Dckt. No. 688, ¶ 22.

With regard to the probability of success on this claim, the Trustee has pointed out that the Court ruled that the lease was *not* rejected, and ruled that the Debtor *timely* moved to assume the lease. <u>Order</u>, Dckt. No. 181 (Oct. 31, 2007); <u>Order</u>, Dckt. No. 286 (Apr. 2, 2008). Clearly the Debtor's failure to file a formal motion led to some legal debates, but those were resolved in the Debtor's favor, subject to any reversal on USPG's appeals which were rendered moot by the Trustee's post-conversion settlements with USPG. More importantly, this theory of recovery is contradicted by the settlement communications with counsel for USPG whose settlement posture was set *prior* to the lease assumption deadline. USPG's $1.6 million offer of August 11, 2005, was contingent on numerous events that never transpired, and that offer was rejected and never renewed. Abdulla's Exh. 16. As of May 25, 2007, and June 19, 2007, the landlord had offered only $250,000.00 and $100,000.00. The settlement posture of USPG prior to the July 11, 2007, deadline is reflected in Keogh's letter of October 8, 2007:

> Given that Sportsman's Link was unable to locate a suitable assignee to pay anything for the lease remainder, it appears that it has little or no market value at all. USPG recognizes that it may be difficult for Sportsman's Link to let go of the fact that a higher buy-out offer was made several years ago under very different circumstances. Just

> so everyone is clear, though, the idea of a large buy-out
> has been *off the table since the time Sportsman's Link
> rejected it several years ago.*

Trustee's Application to Compromise Controversy, Dckt. No. 695, Exh. "F" (emphasis added). The testimony of Keogh at the October 14, 2011, hearing confirmed that his client had no intention of making any large settlement offer after the Debtor filed bankruptcy in 2007. The USPG lease would expire by its terms in 2011. The landlord was under no duty to renew the lease, and in light of the years of litigation between the parties, the likelihood of such renewal seems doubtful.

After a review of the record, the Court agrees with the Trustee's conclusion that the Debtor, as Plaintiff, would have a low probability of success in showing that the handling of the lease assumption issue harmed the estate. *See* Trustee's Affidavit, Dckt. No. 748, ¶ 21 - 30. Indeed, USPG *increased* its offer after the assumption deadline had passed (Trustee's Application to Compromise Controversy, Dckt. No. 695, Exh. "C"), and the Debtor rejected that increased offer. There is nothing to suggest that USPG hardened its position or discounted the settlement value of the lease buy-out as a result of the deadline issue. Moreover, Judge Dalis ruled that a timely assumption occurred and that the Debtor did assume the lease. In hindsight, the lease assumption may not have been a good business judgment, but it is what the Debtor wanted to do, it was considered an essential element of the anticipated Chapter 11 reorganization, and the Defendants succeeding in gaining that asset for the benefit of the estate.

26

(B) Alleged Collusion with Henry's Tackle

Player's Complaint also argues that the "Defendants colluded with Henry's Tackle to allow a false claim to be filed in the bankruptcy court that inflated the amount of 'goods sold' by approximately $87,000.00," and then failed to object to that claim. Player's Complaint, Dckt. No. 688, ¶ 23. Based on the entire record, the Court finds no evidence of collusion. The Trustee has addressed the issue of collusion in his affidavit in some detail. Trustee's Affidavit, Dckt. No. 748, ¶ 42 - 44. First, the Trustee examined the underlying validity of the Henry's Tackle proof of claim and concluded that it is unlikely that the Debtor, as Plaintiff, could prove the debt was not valid. The Trustee reviewed the deposition testimony of both Abdulla and his manager, Ricky Beard, regarding the circumstances under which the inventory was shipped by Henry's Tackle (allegedly out of season), the failure of the Debtor to return the unwanted goods, and the fact that Abdulla reached a tentative settlement to pay the debt. Trustee's Affidavit, Dckt. No. 748, ¶ 42. Abdulla acknowledged that the Debtor in fact received the goods and that no part of the shipment was ever returned.

With regard to the amendment to Henry's Tackle's proof of claim, the Court shares the Trustee's view that there was nothing sinister about the failure to attach the personal guaranty, or the failure to check the box indicating that the claim included interest or attorney's fees. Trustee's Affidavit, Dckt. No. 748, ¶ 43. The record plainly reflects the content of both the original claim and the amendment, which read together and read in conjunction with the Guaranty, clearly reveal that attorney's fees and interest were known

27

by all the parties to be included in the claim amount. Guaranty, Abdulla's Exh. 10; Trustee's Exh. 50. The Trustee believes that there is no merit to any contention of collusion or allowance of a false or inflated claim. Trustee's Affidavit, Dckt. No. 748 ¶ 44. After a review of the entire record, I agree with the Trustee's assessment that the objecting party has neither demonstrated that Debtor would likely succeed on this claim, nor shown that if some portion of the claim that represented interest and/or attorney's fees were stricken, it would benefit the Debtor's estate so substantially as to make the settlement amount unreasonable.

### ( C)  The Plan of Reorganization drafted by Defendants

Player's adversary alleges that "the Plan of Reorganization drafted by Defendants placed Henry's Tackle in its own class and treated it preferentially than all other creditors". Player's Complaint, Dckt. No. 688, ¶ 24. That fact is fairly plain from the Plan. However, the Trustee correctly points out that the Plan submitted by the Debtor on October 9, 2007, (Dckt. No. 176) was never confirmed, and thus Henry's Tackle did not receive any preferential treatment. Trustee's Affidavit, Dckt. No. 748, ¶ 45. Therefore, this allegation does not create a basis for damages in a malpractice action. After a review of the entire record, I agree with the Trustee's assessment that the proposed, and subsequently withdrawn, Plan did not harm the Debtor.

### (D) Alleged Failure to Disclose Conflicts

Player's Complaint alleges that Klosinski failed to disclose connections

with Georgia Bank & Trust, a creditor with claims, and as a result of that conflict of interest[5]

failed to investigate and object to GB&T's claims. Player's Complaint, Dckt. No. 688, ¶¶

25 - 27. Upon reviewing Player's contention that Klosinksi failed to disclose certain conflicts

of interest, the Trustee sent correspondence to the United States Trustee fully advising that

office of the allegations made, the circumstances as known to the Trustee, together with

copies of the affidavits and disclosures submitted by Klosinski in support of his applications

to be employed by the Debtor-in-possession (Dckt. Nos. 17, 18) and later by the Trustee

(Dckt. No. 501). The Trustee has invited the United States Trustee to scrutinize those

transactions and affidavits and the relationship of Klosinski with the named creditor and

adversary defendant. Trustee's Affidavit, Dckt. No. 748, ¶ 46.


As it relates to a legal malpractice action, it is the Trustee's position that any

"disgorgement" of attorney's fees that might be sought by the United States Trustee as a

*sanction* for violations of Rule 2014(a) or other rules requiring disclosure, is not a proper

element of damages. There was no serious dispute with this position. The Trustee has also

taken into consideration the possibility that such conflicts might be admissible in evidence

in a legal malpractice trial, and has concluded that such alleged conflicts and connections do

not substantially strengthen the cause of action for legal malpractice. Trustee's Affidavit,

---

[5]Abdulla raises a similar claim in his Objection to Settlement (Dckt. No. 701, pp. 10, 16-17) as it relates to a defendant in one of the adversaries filed by Klosinksi on behalf of the Trustee. This defendant was a former client of Klosinski's law firm. The adversary was settled and approved by a Court order. A.P. No. 09-01072, Dckt. No. 6. No objections to the settlement were filed. Now Abdulla claims that the defendant received favorable treatment. The Trustee has addressed this allegation of conflict of interest and determined that it does not strengthen the claim for legal malpractice. Trustee's Affidavit, Dckt. No. 748, ¶ 46. After a review of the record, the Court agrees.

Dckt. No. 748, ¶ 47.  After a review of the entire record, I agree.

The question of fee disgorgement remains open, subject to the review and action by the United States Trustee as authorized by 28 U.S.C. § 586(a)(3)(A).[6]

### (E) Failure to Correct Schedules

Player alleges in his complaint that the Defendants failed to correct schedules filed with the Court even when they were advised to correct the same by the United States Trustee.  Player's Complaint, Dckt. No. 688, ¶ 28. The Trustee has thoroughly examined the Debtor's schedules and statement of financial affairs as filed, has reviewed the transcript of the section 341 meeting and other hearing transcripts where those omissions and inaccuracies were raised, and he has concluded, in his judgment, that the failures of counsel to correct schedules had no impact on the ability of the Debtor to reorganize. Trustee's Affidavit, Dckt. No. 748, ¶ 50.  After a review of the entire record, I agree with the Trustee's conclusion.

### (F) Representations to the Court that Debtor Conceded to a Liquidation

Player's Complaint asserts that Defendants informed the Court that the Debtor conceded to a liquidation of the business "when the Plaintiff ardently objected to such

---

[6]Pursuant to 11 U.S.C. § 328(c), the Court may deny allowance of compensation for a professional employed under section 327 or 1103 of title 11 if such professional person is not a disinterested person, or represents or holds an interest adverse to the estate with respect to the matter on which such professional person is employed.

liquidation." Player's Complaint, Dckt. No. 688, ¶ 29. The Trustee examined counsel's failure to oppose all forms of liquidation at the July 22, 2008, hearing on the United States Trustee's Motion to Convert or Dismiss. Trustee's Affidavit, Dckt. No. 748, ¶ 51. Whether Klosinski's representations to the Court that the Debtor had accepted the need to liquidate were "ardently objected to" by the Debtor, the conversion appears to have been inevitable. The Court's Order of April 2, 2008 (Dckt. No. 286), permitting the Debtor to assume the lease was based in large part on Abdulla's proposal to commit additional capital to the Debtor in the form of a pledge of real estate. That pledge never generated the needed capital. At the subsequent hearing on dismissal or conversion, Klosinski urged the Court to allow the Debtor to conduct the liquidation and had the store manager, Ricky Beard, testify about how such a sale over a five month period might benefit the unsecured creditors. The Court acknowledged that a liquidation conducted by the Debtor might generate more revenue than a liquidation by a Chapter 7 trustee, but ultimately determined that this "case crie[d out for . . . independent review and investigation by a trustee." Hearing Transcript, Dckt. No. 701, Abdulla's Exh. 27, p. 56 (Jul. 22, 2008).

I agree with the Trustee's judgment that the conversion of this case was caused, not by the conduct of counsel, but by the financial performance of the Debtor. Sales and profitability of the Debtor were dismal and declining. The Trustee noted, among other factors, the competition being faced by the Debtor from new retailers. Trustee's Exh. 44 at Exh. 9. The Trustee considered whether such a concession to liquidation resulted in damage

31

to the estate, and in his judgment such alleged damage is not evident. Furthermore, the decision to place a trustee in charge of that liquidation was not made by the Defendants but was made, over Debtor's counsel's objection, by the Court. The Court finds that there is no evidence that there was any realistic alternative to the liquidation of Sportsman's Link.

(G) Representations to the Court Regarding Possible Fraudulent and Preferential Transfers

Player's complaint alleges that "Defendants informed the bankruptcy court that the sole shareholder had engaged in numerous fraudulent and preferential transfers immediately before and after the filing of the bankruptcy." Player's Complaint, Dckt. No. 688, ¶ 30. The Trustee's response to this allegation correctly points out the inherent conflict between Abdulla as the objecting party to this proposed settlement and the Debtor. The Debtor would benefit by the recovery of fraudulent conveyances and/or preferences from Abdulla. Although insolvency would have to be proven, counsel's candid admission that a trustee might be interested in pursuing such actions did not damage the *Debtor*. It may be true that Klosinski *believed* that Abdulla was vulnerable to such preference and fraudulent conveyance claims, but I agree with the Trustee's judgment that Klosinski's candid admission of this to the Court does not form the basis of a complaint for legal negligence by the Debtor corporation, as opposed to a claim Abdulla could attempt to pursue.

(H) Infusion of Capital

Player's Complaint asserts that the Defendants "refused to allow Plaintiff

32

to infuse at least $500,000.00, and as much as $1.5 million, from the sole shareholder into the business." Player's Complaint, Dckt. No. 688, ¶ 31. This alleged ground of malpractice is baseless. There is no evidence of money actually being available and tendered. Abdulla's promised infusion of capital was dependent upon his ability to do so. Abdulla testified at the October 14, 2011, hearing that his brother planned to borrow money to raise the necessary funds, using Abdulla's assets as collateral. Nothing in the record shows that this was feasible. Moreover, Klosinksi did not refuse to allow the infusion of money, but rather advised that it would do no good.[7] Abdulla's Exh. 14. The Court concurs with the Trustee's determination that these alleged acts of legal malpractice are unfounded. Trustee's Affidavit, Dckt. No. 748, ¶ 53.

### (I) The Cases Against USPG

Player's adversary does not seem to address as an element of the alleged legal malpractice the manner in which the litigation or potential claims against USPG were pursued by the Debtor's attorneys. However, Abdulla's Objection to Settlement (Dckt. No. 701) addresses the merits of these cases in some detail. The Trustee has examined these claims, and has noted that the Plan of Reorganization that the Debtor submitted in October 2007, (Dckt. No. 176) contemplated that funds that might be awarded on these claims were critical to the reorganization, as it was apparent that the profits from ongoing operations

---

[7] On June 28, 2008, Klosinski sent an email to Abdulla's wife in response to a suggestion to infuse capital into Sportsman's Link, explaining that: "to invest $400,000 in this store at this time, without a drastic cutting of expenses is to simply throw good money after bad." Abdulla's Exh. 14.

33

could not generate enough to fund the plan.

The Trustee argues that there are three problems with this element of the proposed legal malpractice case: (1) Abdulla assumes that he would have won these underlying cases and that the recoveries would have been for substantial sums of money; (2) the Trustee has determined, in his judgment, that the cases were properly pursued both before and after the filing of the Chapter 11 case and that the cases remained viable as of the date of conversion to Chapter 7, when the Debtor and its counsel lost the right to control that litigation; and (3) it was the Trustee, not the Defendants, who settled the cases and caused their dismissal. Trustee's Affidavit, Dckt. No. 748, ¶ 31 - 41.

Without reciting the long history of the USPG litigation in its various forms, it is clear from the Trustee's Affidavit that he has acquainted himself with the theories of recovery, evidence, discovery, and legal issues surrounding the Debtor's dispute with the landlord. *See* Id. The Trustee is satisfied that USPG had potential defenses to each of the allegations of the Debtor that would make the outcome of those cases highly uncertain. The Trustee acknowledges that USPG clearly had a desire to rearrange the shopping center and to move Sam's Club to the Sportsman's Link space, but only the Debtor could make that plan happen. The Debtor declined to cooperate and the move never occurred.

The Trustee has examined the record of the USPG cases and determined

34

that, in his judgment, they were handled properly. The Court agrees with this assessment. As the Trustee has noted, these causes of action against USPG remained viable as of the date of conversion. On July 22, 2008, the Trustee became the real party in interest in those matters. As described in his prior application and the Court's Order approving the same (Dckt. Nos. 407, 422 and 423), the Trustee reached a settlement with USPG and Southern Bank to liquidate the inventory of the Debtor and pay rent to USPG through October 31, 2008, in a reduced amount. USPG filed an administrative rent claim for $616,308.00 and an unsecured claim for $308,154.00. These were valid rent claims that arose because the Debtor succeeded in its efforts to assume the lease. As part of Trustee's settlement, those claims were withdrawn by USPG. *See* Trustee's Affidavit, Dckt. No. 748, Exh. A, ¶ 65; *see also* Dckt. No. 718. Accordingly, the net effect of the Trustee's settlement was equivalent to a reduction in claims against the Debtor by USPG of over $900,000.00, without any contingency fee being paid to counsel.

In the Trustee's judgment, the Debtor did not lose the benefit of these USPG claims as a result of any action of Debtor's prior counsel. After a review of the entire record, the Court agrees with the Trustee's conclusion. Trustee settled all issues with USPG after notice was given to all parties, none of whom objected, and the consideration the estate received was certainly substantial. There is no evidence of malpractice in the handling of those cases.

In sum, the Trustee has demonstrated to the Court's satisfaction that this first factor, the probability of success in the litigation, weighs in favor of the Court's approval of the compromise. Legal malpractice litigation is always a difficult proposition because it requires a Plaintiff to prove "a case within a case." The Trustee believes that the success of the litigation would depend in large part on the testimony of Abdulla. The Trustee's assessment of Abdulla as a witness is a factor for the Court to consider. The Trustee has had many years of experience in a variety of litigation settings. It is the Trustee's judgment that Abdulla does not make a compelling witness, and he has set forth sufficient grounds for believing that Abdulla's credibility and performance as a witness would not strengthen the case for legal malpractice. *See* Trustee's Affidavit, Dckt. No. 748, ¶ 60 - 66. Moreover, I compared Abdulla's testimony with other parts of the record in this case, and I conclude that on key points his version of the facts is largely unsupported and is on balance, unpersuasive.

Finally, even if there is some possibility that a fact finder might reach a different conclusion on the negligence element of a malpractice action, I find that none of the Defendants' actions were the proximate cause of the failure of Sportsman's Link. Sportsman's Link failed because it could not sustain profitability and had to liquidate. Thus, however one views the alleged negligence, I find that no monetary damage was suffered by the Debtor or that any damage was so negligible that a net settlement of $20,000.00 is well within the range of reasonableness.

36

**Complexity, expense, inconvenience, and delay of the litigation**.

The second set of factors to be considered by the Court are the complexity, expense, inconvenience, and delay that pursuing this litigation would present.

(A) Complexity. With regard to complexity, that matter seems self-evident from the size of the record in this case. The record consists not only of the more than 750 docket entries in the underlying bankruptcy case, but the dockets of the 25 adversary proceedings, the state court actions that preceded the filing of the Chapter 11 case, and the collateral litigation involving the Debtor's Federal Firearms License. The evidence of the Debtor's financial transactions and historical performance are voluminous. While the Debtor's Chapter 11 case might not have been overly complex, a legal malpractice case in which a jury will be asked to assess the actions of dozens of players over many years would be complex. Complexity does not weigh in favor of pursuing such a case, but rather favors a settlement.

(B) Expense. Abdulla argues that since Player has offered to pursue this litigation at no expense to the estate, this is not a factor in favor of compromise. The parties disagree about whether the litigation expenses can properly be assumed by Player under ethical rules. A larger problem is that the Trustee contends that Player cannot act as counsel for the Debtor because he would have a conflict of interest. Trustee's Affidavit, Dckt. No. 748, ¶ 68. If this litigation goes forward, the Debtor and Abdulla will be competing for

recovery from the same defendants in two separate lawsuits. In light of this conflict, the Trustee has stated he would not hire Player, and the Court cannot compel him to do so. Whether another lawyer would be as generous as Player in offering to finance this litigation is an open question, but the issue of expense to the estate remains a problem. In sum, the prospect exists for significant expense to be incurred by the estate with no guarantee of a recovery.

( C) <u>Inconvenience and delay in the litigation</u>. As the Trustee points out, the estate would incur the Trustee's administrative expenses for participating in and monitoring the litigation. <u>Trustee's Application to Compromise Controversy</u>, Dckt. No. 695, ¶ 23. The pursuit of this litigation would necessitate keeping this case open, and the Court can fairly anticipate a drawn-out time frame for such litigation to come to trial, with subsequent periods for possible appeals and collection. While the Court might conceivably permit an immediate distribution to creditors and the payment of administrative claims, the Trustee would continue to be obligated to file tax returns for the estate. *See* <u>id.</u> The delay and associated costs are not likely to be offset by the pursuit of this tenuous claim.

**<u>Paramount interest of the creditors and a proper deference to their reasonable views</u>.**

The Court heard testimony from a representative of Southern Bank and Abdulla. In addition, one other creditor filed an objection in the form of a letter (Dckt. No. 698), but this creditor's claim has been revised from an unsecured claim to a priority claim

under 11 U.S.C. § 507(a)(7) and will be paid in full. Dckt. No. 763.

I have considered the views of these creditors and the paramount interest of all creditors in bringing this case to a resolution and allowing the Trustee to make a final distribution. If anything, I infer that silence from the rest of the creditor body implies a level of satisfaction with the compromise, and as a result, the opposition of these parties does not weigh significantly against the proposed settlement.

**Trustee's business judgment**.

The Court has made liberal reference to the views of the Trustee, as reflected in his Application to Compromise, his supporting Affidavit, and his remarks at the hearing, as they relate to the allegations from Player's adversary complaint. The Trustee's business judgment is entitled to deference when reasonable. In re 110 Beaver Street Partnership, 244 B.R. 185, 187 (Bankr. D. Mass. 2000) ("The Court will defer to the trustee's judgment and approve the compromise, provided the trustee demonstrates that the proposed compromise falls within the 'range of reasonableness' and thus is not an abuse of his or her discretion."); In re Still, 444 B.R. 520, 523 (Bankr. E.D. Pa. 2010) (noting that in deciding whether to approve a compromise, the bankruptcy court should avoid second-guessing the Trustee in the exercise of his or her business judgment, but rather should ascertain whether "the terms of the Trustee's proposed settlement fall below the lowest range of reasonableness."); In re Adley, 333 B.R. 587, 608 (Bankr. D. Mass. 2005); see also In re Ashford Hotels, Ltd., 226

B.R. 797, 802 (Bankr. S.D.N.Y. 1998) (explaining that the Court should not substitute its judgment for the Trustee's but should test the reasonableness of the Trustee's proposal).

The Trustee has observed that the success of the legal malpractice case would require that the Debtor, as Plaintiff, establish that the negligence of the Defendants caused either the failure of the Debtor to reorganize through a Chapter 11 or resulted in the recovery of fewer assets for the benefit of creditors than would have occurred in the absence of such negligence. The Trustee has analyzed the financial performance of the Debtor prior to bankruptcy both in terms of its sales, profits (or losses), the competition from other large retailers, its litigation with USPG, possible defaults under its leases, the failure to pay certain creditors in a timely fashion, the ATF license revocation proceeding, and other factors. Trustee's Affidavit, Dckt. No. 748, ¶ 56 - 58. The Trustee has concluded that no acts of negligence on the part of the Defendants resulted in a recovery of fewer assets. Indeed, the pending dispossessory proceeding in state court put the Debtor in a precarious position as of March 13, 2007. The Trustee has further concluded that no acts of negligence on the part of the Defendants caused the reorganization to fail.

In reaching his judgment in this case, the Trustee has analyzed the allegations of Player's adversary complaint and the Objection to Settlement, and he has reviewed the pleadings, motions, and transcripts in the record. The Court's primary objective is to ensure that the Trustee has a sound basis for seeking to settle these claims of legal

40

malpractice for only $20,000.00, and in applying the above standards for reviewing the proposed compromise, I am persuaded that the Trustee has made a compelling case for approval. I am mindful of the fact that I am not to conduct a "mini-trial," much less fully try all issues on the merits, but rather to canvass the issues and determine whether the Trustee's proposed settlement is above the lowest point in the range of reasonableness. In re Topgallant Lines, Inc., 1996 WL 33401346, *4 (Bankr. S.D. Ga. Aug. 26, 1996). The Trustee stands before the Court, bearing a fiduciary responsibility to the creditors in this case and a professional obligation of candor advising the Court that in his professional judgment this settlement is in the best interest of creditors.

His opinion is supported by the evidence, and the settlement presented to the Court by the Trustee is reasonable. The Trustee's determination that the $20,000.00 settlement with Defendants is in the best interest of the estate is justified. The Court concludes that there is nothing in the record that suggests a legal malpractice action would likely result in an award of substantial damages, and the Court should not and will not require the Trustee to pursue litigation that is so speculative simply because the Debtor's principal seeks that result.

## CONCLUSION

Having considered all of the factors that the Court is required to consider in this matter, including the views of the Trustee, the Court is satisfied that the Compromise

41

of Controversy should be granted.

O R D E R

Pursuant to the foregoing, IT IS THE ORDER OF THIS COURT that the Trustee's Application to Compromise Controversy is GRANTED. The Trustee shall be authorized, upon his receipt of $20,000.00, to execute such releases in favor of the Defendants named in Adversary Proceeding Number 11-01031, and any other attorneys or law firms who represented the Debtor before or after the filing of the Chapter 11 bankruptcy case on March 13, 2007, in full satisfaction and compromise of any claims for legal malpractice that the Debtor may have against such parties released.

_____

Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia

This 20th day of December, 2011.